(164 App. Div. 279)

HOLUB–DUSHA CO. v. GERMANIA BANK OF CITY OF NEW YORK.
(No. 6308.)

(Supreme Court, Appellate Division, First Department. November 6, 1914.)

BANKS AND BANKING (§ 148*)—PAYMENT OF CHECKS—FRAUD—FORGERY.

Plaintiff, negotiating with brokers for a purchase of land, having, on their presenting a contract of sale, signed in the name "R. W. B." as the seller, given them a check made payable to "R. W. B.," not knowing who he was, but relying on the fraudulent representations of the brokers, the bank paying it indorsed in such name by one of the brokers, who had so signed the contract, was not liable, though there was such a person as "R. W. B.," who did not own the land, and knew nothing of the transaction; plaintiff's intention being that the check would be paid to the person who signed the contract.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 438–446, 451, 452; Dec. Dig. § 148.*]

Ingraham, P. J., and Hotchkiss, J., dissenting.

Appeal from Trial Term, New York County.

Action by the Holub-Dusha Company against the Germania Bank of the City of New York. From a judgment for plaintiff, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Edward L. Stevens, of New York City, for appellant.
Howard H. Williams, of New York City, for respondent.

SCOTT, J. The action is by a depositor against his bank of deposit to recover the amount paid upon a check on which the name of the payee had been forged. From a judgment for plaintiff, the defendant appeals. The determinative facts are not in dispute.

The plaintiff, a New York corporation, kept an ordinary banking account with the First Avenue Branch of the defendant, which is a New York state bank, upon which it drew checks from time to time. For some time prior to June 11, 1912, the plaintiff had been endeavoring to purchase a site for a manufacturing plant. It entered into negotiations with the Queensboro Corporation, a New York corporation, of which Mr. James H. Robinson acted as the representative. Mr. Robinson showed to Paul F. Dusha, the plaintiff's president, certain lots in Long Island City on the south side of Washington avenue, between Academy street and First avenue. These lots had been listed with the

Queensboro Corporation by Stripe-Hodges Company, a firm of real estate brokers composed of Horace G. Stripe and John A. Fookes, who did business under the name of A. H. Hodges. Stripe-Hodges Company represented to Robinson that they were endeavoring to negotiate a three-cornered arrangement by which the owner of the Long Island City lots would exchange them as a part payment for certain New York City property, and that the owner of the New York City property was trying to arrange for the sale of the Long Island City lots, so as to get some cash out of the transaction if it should be completed.

After some negotiations, in which both Stripe and Hodges participated with Robinson, Stripe finally told Robinson that he thought the Stripe-Hodges Company could sell the Long Island City lots for $16,500, if Robinson would get a $1,000 deposit. Robinson accordingly went to Paul F. Dusha, the plaintiff's president, and received from him on May 21, 1912, a check dated on that day for the sum of $1,000 drawn by the plaintiff to the order of the Queensboro Corporation, as a payment on account of the purchase price of the Long Island City lots in question, to be paid over in the event that a contract for these lots should be entered into. On the next day, May 22, 1912, at the request of Stripe, Robinson had this check certified by the defendant bank. Prior to the certification of the check, Robinson had had no conversation with Dusha about certifying it; but Dusha had been informed shortly before the certification by the manager of the defendant bank that the check had been presented for certification, and had replied in the affirmative to the question of the manager as to whether or not the bank should certify it. A short time afterward, in the course of further negotiations, Stripe-Hodges Company informed Robinson that they were unable to sell the Long Island City lots for $16,500, and finally, on June 10, 1912, Stripe telephoned Robinson that he had a contract for the sale of the Long Island City lots to the plaintiff for $17,500. Robinson accordingly went to the office of Stripe-Hodges Company on June 10, 1912, and there received duplicate contracts between R. W. Birchard, seller, and Holub-Dusha Company, purchaser, for the sale of these Long Island City lots for the sum of $17,500, and acknowledging receipt of the sum of $1,000 on account of the purchase price on the signing of the contracts.

These duplicate contracts purported to be signed, "R. W. Birchard"; such signature being witnessed by Hodges. This was the first time that Robinson had been informed that R. W. Birchard was to be the seller. He had once met a man named Birchard at Stripe-Hodges Company's office, but he did not know anything about the Birchard he had then met, and did not know that his initials were R. W. He did not know anything about that Birchard, and did not know where he was from; but he surmised, after seeing the duplicate contracts, that possibly the seller therein named was the man whom he had met in Stripe-Hodges Company's offices, but he did not know that such was the fact. The duplicate contracts did not state the residence of the seller. Robinson, in receiving the contracts, relied upon the fact that the signature, "R. W. Birchard," was witnessed by Hodges, and thought it was all right. He derived all his information about the seller from Stripe-

Hodges Company. Robinson took the duplicate contracts to Dusha the same day that he received them, and left them with him. The next day he again saw Dusha, and the latter, in the name of the plaintiff as its treasurer, signed the contracts in duplicate, asking Robinson if Stripe-Hodges Company was all right, to which Robinson replied that he thought they were. Dusha then directed Robinson to deliver one of the duplicate contracts to Stripe-Hodges Company and to have the $1,-000 check indorsed by the Queensboro Corporation to R. W. Birchard. Dusha retained one of the duplicate contracts, and Robinson delivered the other, with the $1,000 check, indorsed by the Queensboro Corporation to the order of R. W. Birchard, to the Stripe-Hodges Company.

On June 12, 1912, the $1,000 check was deposited by Stripe-Hodges Company in an account opened by them in their own name in the New Netherland Bank of New York. The check, when so deposited, bore the indorsement: "Pay to the order of Stripe-Hodges Company. R. W. Birchard"—followed by the Stripe-Hodges Company's indorsement. Stripe-Hodges Company subsequently checked out all of the amount of the check, and of a subsequent deposit of $200, except 20 cents. Of the amount so checked out, the sum of $200 was checked out on June 12, 1912, the sum of $52.50 on June 13, 1912, and all the remainder was checked out subsequent to June 13, 1912. On June 13, 1912, the check was presented to the defendant through the clearing house and paid.

Stripe-Hodges Company had no authority to sell the Long Island City lots, in the name of R. W. Birchard, or otherwise. The signatures, "R. W. Birchard," on the duplicate contracts, were written by J. A. Fookes, otherwise known as A. H. Hodges. The indorsement, "R. W. Birchard," on the $1,000 check, was also written by Fookes. Ralphord W. Birchard, the man whom Robinson had met at the office of Stripe-Hodges Company, had no authority to sell the Long Island City lots, and had no interest in those lots at any time. The plaintiff subsequently learned that its contract for the purchase of these Long Island City lots was no good, and that the contract had been signed by Fookes, or Hodges, without authority from the real owner of the property. It also learned that Fookes, or Hodges, had indorsed the $1,000 check in the name of "R. W. Birchard." It thereafter demanded repayment of the amount of the check from the defendant bank, and, upon the bank's refusal to repay, instituted this action.

It is obvious that throughout the transaction Robinson acted as agent for the plaintiff, and that the case is to be considered as if every act done by him had been done by the plaintiff itself. Although the payee named on the face of the check was the Queensboro Corporation, the intention of the drawer was that the check should be indorsed to and be payable to the person, whoever he might be, that should execute a contract for the sale of the lots, and Robinson, when he indorsed the check to R. W. Birchard, meant to make the same payable to the person who signed the contract, and whose name appeared to be Birchard. The case is to be considered, therefore, as if the check had been drawn in the first instance to the order of R. W. Birchard; the circumstance that it passed first through the hands of the Queensboro Corporation being negligible.

The question which presents itself in actions of this kind is whether or not the bank has paid the check to the person to whom the drawer intended that it should be paid. Mere identity of name, while often important, is not a controlling circumstance; for if there happens to be two persons of the same name, and the drawer meant that the sum represented by the check should be paid to one of them, the bank cannot lawfully pay to the other, and, if it does so, it must refund to the drawer. Graves v. American Exchange Bank, 17 N. Y. 205. This fundamental rule has been applied in many cases, some of which were discussed by this court quite recently in the prevailing and dissenting opinions in Hartford v. Greenwich Bank, 157 App. Div. 448, 142 N. Y. Supp. 387.

In the case at bar, it is apparent that the check was paid to the very person to whom the drawer intended that it should be paid; that is, to the person who signed the contract for the sale of the lots. The name Birchard meant nothing to Mr. Dusha, who signed the check. It stood to him merely as the name of a person with whom he had made a contract, and he intended that the money should be paid to that person because he had signed the contract. If a man whose real name was R. W. Birchard, but who was not the person who had signed the contract, had obtained possession of the check and indorsed it, and upon the faith of that indorsement the defendant had paid the check, it would have been liable to refund the money to plaintiff, under the rule laid down in the Graves Case, above cited, because the person to whom the payment was made, although a veritable R. W. Birchard, was not the person to whom the drawer intended that payment should be made. On the other hand, if Hodges, the fraudulent broker, who actually signed the contract in the name of Birchard, had adopted his own real name of "Fookes," had signed the contract and indorsed the check in that name. the transaction would have been completed exactly as it was completed, and there would not have been even the appearance of a forgery. The fact that Hodges adopted for this particular transaction the name of Birchard does not change the complexion of the case. The result of it all was that the check and its proceeds reached the identical person whom the drawer intended that it should reach, to wit, the person who had signed the contract of sale. The fact that Hodges had no authority to sell the lots is not relevant.

It is true that Hodges, or Fookes, committed a fraud upon plaintiff in inducing it to enter into a contract with a person who had no authority to make it. But the defendant was not responsible for that fraud, and the risk that plaintiff might be cheated in this manner was not one which the bank assumed. Its business and duty was to pay the check to the person to whom the drawer intended, when he made it, that it should be paid. If it did that, as I think it clearly did in the present case, it cannot be held liable for the fraud by which the drawer was led to intend that the amount represented by the check should be paid to a person to whom such drawer owed nothing, and from whom it received no consideration. The cases relied upon by the respondent are, I think, all distinguishable from the present by reason of the fact that in none of them was the check paid to the person to whom the drawer intended that it should be paid, while here the contrary appears.

I advise a reversal of the judgment, and, since the question at issue is one of intention, there should be a new trial, with costs to the appellant to abide the event.

CLARKE and DOWLING, JJ., concur.

INGRAHAM, P. J. (dissenting). The plaintiff, a corporation, was a depositor in the Germania Bank of the City of New York, the defendant. On May 21, 1912, plaintiff drew a check upon the defendant, payable to the order of the Queensboro Corporation, for $1,000. That check was indorsed: "Pay to the order of R. W. Birchard" by the Queensboro Corporation; "Pay to the order of Stripe-Hodges Co. R. W. Birchard;" and also indorsed by the Stripe-Hodges Company, and deposited by it to its credit in the New Netherland Bank of the City of New York, by which it was presented to the defendant, and was paid on June 13, 1912. It is alleged that the indorsement of R. W. Birchard was forged, and upon the fact that the indorsement of the check by the payee was a forgery the plaintiff seeks to recover.

There was no serious dispute about the facts, which are substantially as follows: Plaintiff was desirous of purchasing some property in the borough of Queens, and the Queensboro Corporation was acting as its representative in procuring the property that the plaintiff required. A Mr. Robinson, who was a representative of the Queensboro Corporation, received information from one Stripe, who was connected in business with a person calling himself A. H. Hodges, that they had a plot of land for sale which would answer the plaintiff's purposes. Robinson went to the plaintiff's president and submitted this proposition to purchase the land to him, and an offer for it was made. Robinson and Stripe and Hodges then had negotiations about the property, prices were discussed, and finally Stripe said that he thought $16,500 might buy it. This statement was communicated to the plaintiff's president by Robinson, who said that he thought they could make the deal at $16,500, and that if plaintiff's president would give Robinson a deposit, subject to approval, they would let him know in a few days whether the deal could be made or not. The plaintiff's president thereupon gave to Robinson this check for $1,000, payable to the order of the Queensboro Corporation. Robinson went back to his office and notified Stripe that he had a check for $1,000 subject to approval. Stripe asked Robinson whether the check was certified. Robinson said, "No," and Stripe suggested that he get it certified, so that, if they were in a position to make the deal, it could go through without delay. Acting on this suggestion, the next day Robinson went to the bank, had it certified, and retained it. The negotiations continued between Robinson and Stripe and Hodges until the 10th day of June, when he received a telephone message from Stripe that he had the contract ready and to come in for it. Robinson took the check and went to the Stripe-Hodges Company's office, when Stripe presented to Robinson a contract, dated the 10th of June, 1912, whereby one R. W. Birchard agreed to sell and convey this property in Long Island City, borough of Queens, to the plaintiff in consideration of $17,500, payable $1,000 on the signing of the contract, and provided

that the deed was to be delivered on July 11, 1912. This contract purported to be signed by Birchard. Robinson took this contract to plaintiff's president, and said that $17,500 was the best he could do, as Stripe had said that nothing less would buy the property. Robinson then took plaintiff's check out of his pocketbook, and told him he would have to pay $17,500 or take his check back. The plaintiff's president would not sign the contract that day, but said he would make up his mind the next day, and Robinson kept the check and the two contracts. The next day Robinson went back with the check and the contracts to the plaintiff's president, when the plaintiff's president signed the contracts and gave them back to Robinson, and told him to go ahead and close the matter up as soon as he could, and to indorse the check over to Birchard, who was the contracting party and who had agreed to convey. Robinson followed those directions, had the Queensboro Corporation indorse the check to Birchard, and delivered the check, indorsed to Birchard, and the contract signed by Birchard and plaintiff, to Stripe or Hodges. Thereafter Hodges indorsed the name of Birchard on the check, making it payable to the Stripe-Hodges Company, deposited the check in the New Netherland Bank to the account of that firm or corporation, and the money was subsequently withdrawn from that account. It subsequently appeared that Birchard was a real estate dealer living in Connecticut; that he knew nothing about the transaction, his name to the contract being forged by Hodges, who also forged his name to the check; that he had never heard of the property, had no interest in it, had made no offer to sell it, and had not negotiated in relation to it; and that Stripe or Hodges had used his name without his authority, both in making the contract and in receiving and indorsing the check.

I think, throughout all this transaction, that the Queensboro Corporation and Robinson were acting solely as agents for the plaintiff. Neither Robinson nor the company had any interest in the check, but merely received it from plaintiff to apply on the purchase of the property when the contract was made. The check, therefore, first acquired validity when indorsed by the payee, the Queensboro Corporation, plaintiff's agent, over to Birchard, who was assumed to be the contracting party, and to whom the money was to be paid. The certification of the check was, therefore, a certification at the request and for the benefit of the drawer, and I think the transaction must be treated as if the drawer himself had the check certified. The check, therefore, having been drawn by the plaintiff and certified by its agent, remained in its possession until Robinson delivered the check, at the direction of plaintiff's president, to Stripe-Hodges Company for the account of the plaintiff.

It is entirely clear from this transaction that this check was obtained from plaintiff and its agent, Robinson, by fraud. It was based upon a contract purporting to be signed by Birchard, which was not in fact signed by him, and of which he had no knowledge. It purported to be an obligation of Birchard to convey this property to plaintiff, when Birchard had no title to the property, had no means of acquiring it, and knew nothing of the transaction, and his name had been forged to the contract. The plaintiff had directed that the check

should be indorsed to Birchard, who was the contracting party; and therefore it was to Birchard, who made the contract. that the plaintiff directed the bank to pay the money. The check having been thus obtained by fraud, it never had a valid inception in the hands of Stripe or Hodges. What plaintiff intended to do was to assume the payment of this $1,000 to the Birchard who had executed the contract to convey the property to it, and never intended that the money should be paid to Stripe or Hodges. The delivery of the check payable to the order of the person who had made the contract to convey the property was based entirely upon the validity of the contract, and that it was a bona fide contract which would insure to the plaintiff a conveyance of the property. The contract itself was a fraud and a forgery. The check was obtained from plaintiff and its agent, Robinson, by fraud; and I do not think that either Stripe or Hodges ever obtained, as against the plaintiff, any title to the check or right to collect it.

I think the decision of this court in Anglo-South American Bank, Ltd., v. Nat. City Bank, 161 App. Div. 268, 146 N. Y. Supp. 457, is applicable to this case. This court in deciding that case said:

"Undoubtedly, if this check had lawfully come into the hands of the payee, and the payee or any indorsee or transferee thereof had presented the check to defendant, who had certified it, the bank would have been the principal debtor, the plaintiff as drawer would have been discharged, and the defendant would have become liable to the legal holder of the check. But, from the facts found by the referee, the check was never legally negotiated or delivered to the payee by the plaintiff. Possession of the check had been obtained by fraud, not by the payee, but by the conspirators, who had been guilty of fraud. * * * This check in the hands of the conspirators was never a valid negotiable instrument. It had its inception in fraud, the certification was procured by fraud, the indorsement was forged, and the payment was obtained by a fraudulent scheme to defraud the plaintiff. The plaintiff was entitled to repudiate the whole transaction, and, the payee never having indorsed the check, the defendant was not justified in paying it and was under no obligation either to the payee or to the holder of the check, who had secured no title to it, and who had no authority to negotiate it or collect it. By the certification of the check the certifying bank became indebted to the lawful holder of the check; but, if there never was a lawful holder of the check, or a person entitled to enforce the check or collect the amount thereof, I do not see that the certification of the check can affect the liability of the drawer, nor is the bank certifying it under any obligation to pay it. It seems to me clear, if defendant had refused to pay the check, that neither the trust company, in which it had been deposited, nor any other holder, in the absence of an indorsement by the payee, could have recovered the amount thereof from the defendant. That being so, the defendant had plaintiff's money on deposit, which it had set aside to pay this check when presented, properly indorsed by the payee, and therefore, it never having been indorsed, it never could have been collected."

It seems to me that what was said in that case directly applies to the case at bar. The check was procured from the plaintiff's agent, the drawer, by fraud, based upon a contract that was forged, and which contract purported to be an agreement to convey real property to the plaintiff, the maker of the check. The person purporting to make such a contract had no relation to the property and no means of acquiring it. He knew nothing of the transaction, and had never undertaken to convey; and when plaintiff's president directed that the check should be drawn to the maker of that contract, he certainly did not

intend that it should be paid to Stripe or Hodges, but to the person whoever he was, that was acting as principal and who had purported to execute the contract. If that check had actually come into the possession of Birchard, to whom it was payable, and he had actually indorsed it, and it had then come into the hands of a third party, who received it for value, an entirely different question would have been presented. But here Stripe or Hodges procured the check by fraud, the name of the payee was forged, and by them the check was collected through the agency of the New Netherland Bank, with which they deposited it for their own account, and which in express terms guaranteed the indorsements. It seems to me quite clear that if the defendant had refused to pay the check, on the ground that the indorsement of Birchard was forged and the check had been obtained by fraud, the New Netherland Bank could not have enforced payment; and, the defendant having paid it on the faith of the New Netherland Bank's guaranty of prior indorsements, I do not think that the defendant can resist the demand of the plaintiff, who had its money on deposit with defendant to pay this check when properly indorsed by the holder, and when it had never been so indorsed. By the certification, undoubtedly the bank became indebted to the holder of the check when properly indorsed; but on the facts here found no one ever obtained a good title to the check, and it was not indorsed by Birchard, to whom it was made payable.

It seems to me to be entirely beside the mark to say that the plaintiff intended to pay the check to the person who actually signed the contract to convey the property, that Hodges was that man, and, therefore, that the indorsement of the check in Birchard's name by Hodges was the indorsement by the person intended by the plaintiff as the person to receive the $1,000. In this case, the fraud in the whole transaction vitiated the contract to buy the property, and, therefore, there never was a valid delivery of the check. Plaintiff having directed the check to be indorsed by Birchard, and there being a Birchard whom Robinson, plaintiff's agent, knew as a real estate dealer, there certainly was never any intention on behalf of the plaintiff that the check should be payable to anybody but Birchard, who, it was assumed, had signed the contract for the sale of the property. If Hodges had signed the contract, it could not be assumed that plaintiff would have willingly delivered a check payable to his order without some inquiry as to his responsibility or ability to fill his contract. I think it may well be assumed that the plaintiff, when ordering the check to be indorsed over to Birchard, the contracting party, understood that he was dealing with some third party for whom the Stripe-Hodges Company was acting as agents, and that he had therefore the responsibility of a third party, and was not relying solely upon the responsibility of the Stripe-Hodges Company.

I am also of opinion that the principle established in Critten v. Chemical Nat. Bank, 171 N. Y. 219, 63 N. E. 969, 57 L. R. A. 529, should be applied in this case. In that case the plaintiff sued to recover from its banker an alleged balance of deposit due to it from the bank. The bank in that case had paid out of the plaintiff's account certain checks altered by one Davis, an employé of the plaintiff. On

the trial, the alteration of the checks by Davis was established beyond contradiction, and the substantial issue litigated was that of the plaintiff's negligence. The court below found that the plaintiff was not negligent, and directed a judgment for the plaintiff. In deciding that case the court said:

"Moreover, we see no reason why the bank should be entitled to anything more than indemnity for the loss the depositor's negligence has caused it. In the present case, a check altered by Davis from the sum of $22 to $622 was paid by the defendant to the Colonial Bank, in which Davis had deposited it. Against that bank the defendant has ample recourse. If it were to be held that the plaintiffs are estopped from denying the genuineness of that check as against the defendant, the latter could have no claim against the Colonial Bank, nor is it clear that the plaintiffs would have any direct right of action against that bank. The Colonial Bank took the check solely on the responsibility of Davis. To it the plaintiffs owed no duty. If the plaintiffs and the defendant had never settled their accounts, the Colonial Bank could have had no complaint against either party for that cause. A rule which might operate to relieve that bank from the liability it assumed when it collected an altered check, merely because the plaintiffs failed in their duty, not to it, but to a third party, should not be upheld. Nor would it operate justly in a case in which the bank had paid a single forgery, unless by the depositor's default and delay the bank had lost its opportunity to secure restitution."

I cannot see why this rule should not apply to the facts in this case. Here this check, having been obtained by fraud from the plaintiff, was paid to the New Netherland Bank upon a forged indorsement. The defendant has a remedy against the bank to whom it paid the check, and it is sought to relieve the defendant from liability because of some assumed intention on the part of the plaintiff to deliver the check to the person who actually signed the contract for the conveyance of the real property. The check was drawn to the order of the person who was the assumed party to that contract. There was such a person in existence, who was connected with the brokers who assumed to represent him, and that was known to the agent of the plaintiff when the check was delivered. The check was then deposited with the New Netherland Bank, not to the credit of the person to whom the check was payable, but to the credit of the Stripe-Hodges Company, and their title to the check appeared on its face to be through an indorsement of the person to whom the check was payable. The New Netherland Bank presented the check to the defendant and guaranteed the indorsers; and in consequence of that guaranty and relying upon it the defendant paid the check. If Hodges had presented the check at the counter and asked the defendant to pay it in cash, it is clear that the defendant would not have paid it without a responsible guaranty. It received that responsible guaranty from the New Netherland Bank, and, relying upon that guaranty, paid the check. Certainly, as between the plaintiff and the New Netherland Bank, the latter bank should suffer the loss, and not the plaintiff; and as the defendant is. protected by the guaranty of the New Netherland Bank, I do not think that upon these facts it is in a position to resist the claim of the plaintiff to refund the amount of the check.

I am therefore in favor of affirming this judgment.

HOTCHKISS, J. (dissenting). I think it is quite impossible to say that the drawer of the check meant that it should be paid to Hodges.

It seems to me that was the very opposite of the drawer's intention. The evidence is uncontradicted that Hodges did not pretend to be Birchard, but represented himself as having authority to act for Birchard as broker. I think the present case is controlled by the principles of Shipman v. Bank of State of N. Y., 126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791, 22 Am. St. Rep. 821, Seaboard Nat. Bank v. Bank of America, 193 N. Y. 26, 85 N. E. 829, 22 L. R. A. (N. S.) 499, and Phillips v. Mercantile Nat. Bank, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596. See North British & Mercantile Ins. Co. v. Merchants' Nat. Bank, 161 App. Div. 351–354, 146 N. Y. Supp. 720.

The judgment should be affirmed.