[No. 7132.   Decided February 29, 1908.]

JOSEPH G. HEIM et al., *Respondents*, v. MAX NEUBERT et al.,
*Appellants*.[1]

BANKS AND BANKING—DRAFTS—LIABILITY OF CUSTOMER TO BANK.
Where defendants, who were customers of plaintiffs' bank, pur-
chased a New York draft that had been issued to J. C., but which
had come into the possession of another person of the same name
who claimed to be the payee and forged the payee's endorsement,
and after warning as to their liability, endorsed the draft and ad-
vanced part of the sum to the forger, and left the draft for collection,
and upon notice from New York that it had been paid, purchased
another draft of the plaintiffs for the balance and sent it to the
forger, and the latter draft came into the hands of an innocent pur-
chaser for value, who recovered judgment thereon against the plain-
tiffs, who had stopped payment and defended at defendant's request,
the equities of the case make the defendants liable over to the plain-
tiffs for the amount of the draft, the plaintiffs having given defend-
ants prompt notice of the forgery of the first draft as soon as it was
discovered; since there was no negligence or improper banking
making plaintiffs' bank responsible to defendants for the amount
of the draft.

Appeal from a judgment of the superior court for Pacific
county, Reid, J., entered July 20, 1907, upon findings in
favor of the plaintiffs, after a trial on the merits before the
court without a jury, in an action against the endorsers of a
bank draft. Affirmed.

*W. H. Abel*, for appellants.

*Sol. Smith* and *H. W. B. Hewen*, for respondents.

DUNBAR, J.—On December 4, 1904, a person, representing
himself to be James Crosson, attempted to negotiate with the
South Bend Banking Company a $500 draft issued in favor
of one James Crosson by the First National Bank of Grand
Rapids, Michigan, upon the National Bank of Commerce of
New York City.   As it afterwards developed, the person

[1]Reported in 94 Pac. 104.

representing himself to be Crosson was not the Crosson to
whom the draft was issued, and he is referred to in the brief
of appellants as the "wrong" Crosson.   The South Bend
Banking Company refused to negotiate the draft, and Neu-
bert & Cooper, the appellants in this action, who were custom-
ers of the South Bend Banking Company, went to the bank,
claiming to be acquainted with Crosson, and endorsed his
draft.   Mr. Cooper, one of the firm, first went to the bank
for this purpose and the cashier explained the responsibility
of the endorsement to Mr. Cooper, who was inclined after
such explanation to withdraw the endorsement, but did not do
so.   A short time afterwards Mr. Neubert, the other member
of the appellant firm, returned to the bank, with the draft
still bearing the endorsement, and desired the bank to pur-
chase the draft.   The same warning was given to Mr. Neubert
by the cashier that was given to Mr. Cooper, but Mr. Neubert,
acting for the firm of Neubert & Cooper, notwithstanding the
doubts expressed by the cashier, purchased the draft and left
it with the bank for collection, and the appellant firm was
credited with the amount of the draft.   On this question of
the warning given by the cashier there is a conflict of testi-
mony, but we are satisfied from the record that the statement
of the cashier is correct.   At this time $100 was paid by the
appellants to Crosson, and afterwards $25 more, making $125.
Of this amount of money there is no question, the appellants
admitting that they are liable therefor.   The $125 was
charged to the account of Neubert & Cooper.

With the endorsement of Neubert & Cooper, the bank took
the draft for collection for them and sent it to its correspond-
ent in New York for that purpose.   On the 22d day of De-
cember, 1906, the respondents received advice from New York
that the draft had been paid, and immediately notified Neu-
bert & Cooper, by telephone communication, of their advices
from New York; whereupon Neubert & Cooper purchased a
draft for $375 on the National Bank of Commerce at Ta-

coma, Washington, payable to the order of James Crosson, and forwarded the same to the payee at Seattle, Washington, and this draft is the subject-matter of the action. The payee of the draft, the wrong Crosson, sold it to Jamieson & Mc-Farland, who turned it in to the bank with which they did business at Seattle, for collection from the drawee bank at Tacoma. On or about the 7th or 8th of January, 1905, respondents received word that the .endorsement upon the New York draft was a forgery, and immediately communicated the fact to Neubert & Cooper. It seems that the draft had been properly issued to one James Crosson who lived in the city of Aberdeen, and had by some means come into the possession of the wrong J. Crosson, who assumed to be its owner. Suit was brought by Jamieson & McFarland of Seattle, who finally became *bona fide* holders for value, against the respondents in this action, to recover the $375. Judgment was obtained against the respondents in that case and, on appeal, was affirmed by this court. *Jamieson & McFarland v. Heim,* 43 Wash. 153, 86 Pac. 165. The respondents paid the judgment, and bring this action against the appellants, the endorsers of the note, for the amount paid by them, with costs. We are convinced by the record, although there is some conflict in the testimony, that the former action was defended by the respondents at the instance and request of the appellants, who at that time recognized themselves as being responsible for his draft. In the present action judgment was found by the trial judge in favor of the respondents for the amount claimed.

This is an unusual case. It is not the ordinary case of a forgery of a draft or of the irresponsibility of the parties. The draft was properly paid by the correspondent of the respondents, but the money represented by the draft was paid to the wrong man. The findings of the lower court were set forth in the form of an opinion. This opinion of the court, it seems to us, covers the equity of the case, and we endorse it by

reproducing it here. After reviewing the facts in the case, the court said:

"The only question that bothers me so far as the plaintiffs are concerned is whether or not the bank was guilty of negligence or carelessness which resulted in getting Neubert into trouble in the way of taking that $375 draft. On the other hand, the bank probably would never have heard anything in the ordinary course of business beyond what they already heard, that they had received credit. No doubt in the ordinary course of banking business they acted upon the information they had at the time, that they had received credit from their New York correspondent. Here was this endorsement of Neubert & Cooper on this commercial paper, and that should not be considered a light matter. Banks could scarcely be able to make collections for people if they could not rely upon these endorsements in cases of an unusual occurrence such as this here. Both the bank here and Neubert & Cooper were honest in their intentions in wanting to do what was right, and it is unfortunate that such occurrences as this can happen. But it does not seem to me that the bank should be compelled to suffer because it hardly can be called negligence or careless or improper banking for these people to do what they did, they having warned both these people about this draft, they apparently having had suspicion, warned both of the persons who signed it that they were liable to get into trouble, and certainly if it had not been endorsed by these people, if it hadn't been for their anxiety the bank would not have anything to do with it at all. It is only by reason of the fact of these endorsements and the insistence more or less of Neubert that the bank did take the draft for collection. They acted upon the advice of their correspondent that they had received credit for it. It does not appear affirmatively that they did actually tell either Neubert or Cooper that the thing had actually been paid. There is no testimony contradicting the cashier as to what he told Neubert, and in view of the fact that he was acting with circumspection himself and had warned these people about this draft, I think that it is not justice to hold the bank liable to suffer this loss."

We think the claim by the appellants that a settlement was made between these parties, that the appellants should be re-

sponsible for only $125, is not sustained by the record. Under
the undisputed testimony the bank had refused to deal with
Crosson under any circumstances, and all the transactions had
were with the appellants, who bought the draft of Crosson and
who were credited with the amount of the draft by the bank
and charged back with the amount that the appellants drew
out as payments to Crosson. In the ordinary course of busi-
ness it would probably not have been the duty of the bank to
have notified the appellants that the draft had been honored.
Banks act upon the presumption that drafts are valid when
they take them for collection and give credit to the depositors
for the amount of the draft, subject to a charge back if the
draft is found to be worthless. Ordinarily no notification is
made. But in this instance, by reason of the communications
had between the bank and these appellants, the bank knew that
the appellants were owing to Crosson the amount of $375 on
the draft, and that they were anxious to send it to him, having
his address, and notified them purely as a matter of accommo-
dation.

Under all the circumstances of the case, we think it would
be inequitable to hold the bank responsible for the amount of
the draft, and the judgment of the lower court is therefore
affirmed.

HADLEY, C. J., CROW, MOUNT, and ROOT, JJ., concur.